IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

- - -

DAISY LOVE,                          :CIVIL ACTION
                                     :
                Plaintiff,           :
                                     :
            vs.                      :
                                     :         COPY
RANCOCAS HOSPITAL and                :
STEVEN OXLER, M.D. and               :
SUNSET ROAD MEDICAL ASSOC.,:
P.A., and ANDREW J. BLANK, :
D.O., and GARY D.                    :
GREENBERG, P.A.-C. and               :
JOHN DOE, MARY DOE, ABC              :
PARTNERSHIPS, and XYZ                :
CORPORATIONS, and JOSEPH             :
LEVIN, M.D.,                         :
                                     :
                                     :
                Defendants.  :NO. # 01cv5456

- - -

- - -
THURSDAY, OCTOBER 30, 2003
- - -


        Oral deposition of BETH BENN, R.N.,

held at Lourdes Medical Center of Burlington County,

East Building, Willingboro, New Jersey, commencing

at 11:00 a.m., on the above date, before Kimberly A.

Hussey, Certified Shorthand Reporter and Notary Public

of the State of New Jersey.


-------------------------------------------------------
B & R SERVICES FOR PROFESSIONALS, INC.
235 SOUTH 13TH STREET
PHILADELPHIA, PENNSYLVANIA  19107
(215) 546-7400    FAX (215) 985-0169

2

A P P E A R A N C E S:

KLINE & SPECTER, P.C.
BY:  RICHARD S. SEIDEL, ESQUIRE
1800 Chapel Avenue
Suite 302
Cherry Hill, New Jersey  08002
(856) 424-9162
Counsel for the Plaintiff

PARKER, McCAY & CRISCUOLO, P.A.
BY:  MARY KAY WYSOCKI, ESQUIRE
Three Greentree Centre
Route 73 and Greentree Road
Marlton, New Jersey  08053
(856) 596-8900
Counsel for the Defendants Sunset
Road Medical Association, Joseph
Levin, M.D. and Andrew Blank, D.O.

STAHL & DeLAURENTIS, P.C.
BY:  JENNIFER PARSONS, ESQUIRE
1103 Laurel Oak Road
Suite 103
Voorhees, New Jersey  08043
(856) 380-9200
Counsel for the Defendant Rancocas
Hospital

BLUMBERG & LINDEN
BY:  CHARLES B. AUSTERMUHL, ESQUIRE
158 Delaware Street
Woodbury, New Jersey  08096
(856) 848-7472
Counsel for the Defendant Steven
Oxler, M.D.

LAW OFFICES OF FRANCIS E. SCHACHTELE
BY:  BENJAMIN HAFTEL, ESQUIRE
50 Millstone Road
East Windsor, New Jersey  08520
(609) 371-2436
Counsel for the Defendant Gary
Greenberg, P.A.-C.

3

# I N D E X

WITNESS                                          PAGE

BETH BENN, R.N.

  By Mr. Seidel                                     4

# E X H I B I T S

NO.                   DESCRIPTION               PAGE

(None marked.)

B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    4

1                           - - -

2                    (It is hereby stipulated and

3            agreed by and among counsel that reading,

4            signing, sealing, filing and

5            certification are waived; and that all

6            objections, except as to the form of the

7            questions, be reserved until the time of

8            trial.)

9                           - - -

10                       BETH BENN, R.N.

11           having been duly sworn, was examined and

12           testified as follows:

13                          - - -

14   BY MR. SEIDEL:

15     Q.    Nurse Benn, my name is Richard Seidel.  I'm going

16   to be asking you a series of questions.

17           The first question I have for you is where are

18   you currently employed?

19     A.    At -- here at Rancocas.

20     Q.    And how long have you been employed at Rancocas

21   Hospital?

22     A.    A little over three years.

23     Q.    Were you employed by Rancocas Hospital on March

24   10th, 2000?

25     A.    Yes.

                B & R   SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                        5

1    Q.   At that time how long had you been with the

2   hospital?

3    A.   I started -- I can't -- I think I started in

4   January.  I have to look, you know, I can't tell you

5   exactly.

6    Q.   So approximately three months before --

7    A.   Yes.

8    Q.   -- treating Daisy Love?

9    A.   Yes.

10    Q.   Tell me what your title was when you joined the

11   hospital.

12    A.   R.N.

13    Q.   And is that the same as it is today?

14    A.   Yes.

15    Q.   Did you have any administrative responsibilities

16   back in March of 2000?

17    A.   No.

18    Q.   Were you involved in any way with the drafting of

19   procedures or rules with regard to nursing conduct in

20   the hospital?

21    A.   Like making the rules?

22    Q.   Yes.

23    A.   No.

24    Q.   Were you required when you joined the hospital in

25   approximately January of 2000 to learn the rules and

B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                          6

1    procedures in the patient care manual at the hospital?

2       A.    Yes, we have an orientation.

3       Q.    Describe the orientation for me.

4       A.    It's a two-week orientation of classes, you go

5    through the policies and procedures.

6       Q.    Were you familiar as of March of 2000 with any

7    policies and procedures at the hospital that addressed

8    the taking of vital signs and how often those vital

9    signs should be taken?

10      A.    I don't recall.

11      Q.    It is my information that there was a policy and

12   procedure in place back at that time that required that

13   blood pressures above 140 over 90 or below 90 over 60 be

14   taken every 15 minutes until stabilized.  Were you

15   familiar with that procedure?

16      A.    I don't remember.

17      Q.    You don't remember if you were familiar with that

18   procedure?

19      A.    Not back -- not three years ago.  I don't recall.

20      Q.    Do you recall if you were familiar with the

21   follow-up procedure to that, and that is once the

22   patient was stabilized that the blood pressure should be

23   taken every two hours thereafter to make sure it

24   remained stable?

25      A.    I don't remember.

                B & R   SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    7

1    Q.    Are you familiar with that today?

2    A.    Yes, I am.

3    Q.    And do you recall whether that would have been

4    part of your orientation?

5    A.    I don't remember.

6    Q.    With regard to those policies and procedures, can

7    you tell me what policies and procedures you do remember

8    going over?

9    A.    Three years ago we went over, you know, the

10   policy and procedure manual and we looked things up, but

11   three -- that was three years ago.  I don't remember

12   exactly the policy and procedure book, you know, what I

13   knew back then.

14   Q.    Well, I'm not asking you to remember the entire

15   policy and procedure book.  I want to know if you were

16   taught -- let me ask you this:  Do you remember any of

17   your classes from your first year in nursing school?

18   A.    Not really.

19   Q.    No?  Do you remember whether you were taught in

20   nursing school what a normal blood pressure was?

21   A.    I --

22              MS. PARSONS:  Object to the form.

23        You can answer.

24              THE WITNESS:  Pardon me?

25              MS. PARSONS:  You can answer.  Go

         B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    8

1          ahead.

2      A.    Yes.

3  BY MR. SEIDEL:

4      Q.    Do you remember in nursing school learning what

5  an abnormal blood pressure was?

6      A.    Yes.

7      Q.    Do you remember in nursing school learning how

8  often blood pressures should be taken if a blood

9  pressure was abnormal?

10     A.    That was back in 1964.  I don't remember what it

11 was back then.

12     Q.    Tell me what your recollection was of what the

13 procedure was for taking blood pressures for patients

14 back in March of 2000.

15     A.    March of 2000?  I don't remember the policy at

16 that time.

17     Q.    I understand.  I'm not asking you for the

18 hospital policy now.  Now, I'm asking you for your

19 nursing training.

20     A.    In my nursing experience?

21     Q.    In your nursing training and experience --

22              MS. PARSONS:  Let him finish.

23              THE WITNESS:  Okay.

24 BY MR. SEIDEL:

25     Q.    -- how often would you take the blood pressure of

              B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    9

1    a patient who had a blood pressure above 140 over 90?

2        A.    Above 140 over 90?  Professionally with my

3    experience, I would be taking it anywhere from five

4    minutes to 15 minutes.

5        Q.    And once that patient became stabilized, in other

6    words, the blood pressure dropped below 140 over 90, how

7    often would you take a blood pressure?

8                    MS. PARSONS:  Object to the form.

9            You can answer.

10                   THE WITNESS:  Okay.

11       A.    I would take it every 30 minutes, 15 to 30

12   minutes.

13                   MR. HAFTEL:  I'm sorry, every

14           what?

15                   MR. AUSTERMUHL:  Every 15 to 30

16           minutes.

17                   MS. PARSONS:  Can you speak up a

18           little bit?

19                   MR. HAFTEL:  If you can keep your

20           voice up a little bit.  Thanks.

21                   THE WITNESS:  You're welcome.

22   BY MR. SEIDEL:

23       Q.    Do you know if there was a policy and procedure

24   in the hospital back in March of 2000 that if there were

25   any changes in blood pressure that went from normal to

BETH BENN, R.N.                              10

1    abnormal after the pressure had been stabilized that you

2    were required to notify the physician who was attending

3    to the patient?

4                    MS. PARSONS:  Object to the form

5          of the question.  You can answer.

6     A.    I would automatically inform the doctor.

7    BY MR. SEIDEL:

8     Q.    So if a blood pressure rose above what was

9    considered a stable level, you would automatically

10   notify the --

11    A.    Yes, I would.

12    Q.    -- attending physician?

13    A.    Definitely.

14                   MS. PARSONS:  Let him finish his

15         question.

16                   THE WITNESS:  Okay.  I'm sorry.

17                   MS. PARSONS:  She's writing

18         everything down.  It will get very

19         confusing later.

20   BY MR. SEIDEL:

21    Q.    I realize it's three years later.  Do you have a

22   specific recollection, other than the records that sit

23   before you, of treating Daisy Love?

24    A.    No, I do not, sir.

25    Q.    Do you have a specific recollection of any

B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    11

1   conversations between yourself and Dr. Oxler during the

2   care and treatment of Daisy Love?

3       A.    Can you clarify that?

4       Q.    Other than the records that sit before you, do

5   you have a specific recollection as we sit here of any

6   conversations between yourself and Dr. Oxler while

7   treating Daisy Love?

8       A.    No.

9       Q.    So any recollection that you have today would be

10  that which is contained in the medical records?

11      A.    Well, when I'm taking -- when I'm caring for a

12  patient, if there's any problem I automatically tell the

13  doctor.  It doesn't have to be, you know, exactly

14  written there doctor informed.

15      Q.    Nurse Benn, I asked if you have a specific

16  recollection, other than what is contained in the

17  records, of anything that you did or spoke to Dr. Oxler

18  about.

19              MS. PARSONS:  He's not talking

20          about --

21              THE WITNESS:  I don't understand.

22              MS. PARSONS:  He's not talking

23          about your memory being jogged by looking

24          at the records or he's not asking about

25          what your policies are.  He's just asking

              B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    12

1              aside from all of that if you remember

2              talking to Dr. Oxler.

3      A.   No.

4    BY MR. SEIDEL:

5      Q.   So unless it's contained in this record, you have

6    no specific recollection of it?

7                   MS. PARSONS:  Object to the form.

8              You can answer.

9      A.   I'm -- I don't understand what you're talking --

10   what you are, you know, saying.

11   BY MR. SEIDEL:

12     Q.   I'm not sure why it's unclear.

13     A.   It is.

14     Q.   If it is not in this record today --

15     A.   Then I never talked to him about anything?

16     Q.   Do you have a memory of anything that is not

17   contained in this record?

18     A.   Oh.

19                  MS. PARSONS:  Just object to the

20             form.  You can answer him if you

21             understand the question.

22     A.   Everything that's on here I had talked to him

23   about.

24   BY MR. SEIDEL:

25     Q.   Ma'am, do you have a memory of anything that is

                B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    13

1    not contained in this record?

2      A.    No.

3      Q.    Were you the nurse that triaged Daisy Love when

4    she was admitted to the emergency room?

5      A.    No.

6      Q.    Who was the nurse who triaged Ms. Love?

7      A.    I can't read the writing of the triage nurse.

8      Q.    You don't recognize the handwriting?

9      A.    No.

10     Q.    Do you know who the triage nurses were at that

11   time?

12     A.    No.

13     Q.    By the way, were you specifically assigned to the

14   emergency room as part of your duties?

15     A.    I've been an emergency room nurse, yes.

16            MS. PARSONS:  Just let him finish

17        his question.  In conversation you'd

18        anticipate --

19            THE WITNESS:  Okay.

20            MS. PARSONS:  -- what he's

21        saying, but you can't do that today.

22            THE WITNESS:  Okay.

23   BY MR. SEIDEL:

24     Q.    As of March of 2000, were you assigned to the

25   emergency room department?

           B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                          14

1    A.    Yes.

2    Q.    Did you work in any other department in the

3    hospital?

4    A.    No.

5    Q.    Was there a specific staff of nurses, whether

6    they be triage nurses or treating nurses, that worked in

7    the emergency room at Rancocas Hospital?

8    A.    Just the emergency room staff.

9    Q.    And was that the same staff all the time?

10   A.    Yes.

11   Q.    Do you recall who -- list for me the names of the

12   nurses that you recall being on staff in March of 2000.

13          MS. PARSONS:  Objection.  You can

14          answer.  Go ahead.

15   A.    I don't remember all of them.  A lot of them

16   left.  It's not the same staff that is here today.  In

17   2000 there was some agency nurses that also came in.

18   BY MR. SEIDEL:

19   Q.    Can you tell me who you do remember?

20   A.    Okay.  Let me see.  Who has been there.  Let me

21   see.  Beth has been there.  On the day shift, the

22   evening shift?

23   Q.    Whoever you can remember.

24   A.    Okay.  Let me see.  Maggie; Marilyn; Sonia.

25   Q.    Do you have last names?

          B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    15

1    A.    Sonia Robinson; Kathy Ward.  I'm trying to think

2    in 2000 who was still there.  Diane Presswood; Flow

3    Baker.  Let's see.  Joan Gallagher; Linda Pine; Debbie

4    Ostrander.  There was -- there's quite a few that left

5    right in the middle of 2000 that were staff there.  Pat

6    Edwards.  There was -- during the day shift I don't

7    remember anyone else.

8    Q.    Were there people on the staff that were

9    specifically assigned as triage nurses as opposed to

10   nurses that would be working the treatment area?

11   A.    We take turns with assignments.

12   Q.    On that day, what was Ms. Love's blood pressure,

13   at least the first recording of the blood pressure?

14   A.    That was written by the first nurse that came

15   in -- no, the triage nurse would be the first reporting.

16   I can't read the bottom number.  197 and I think it's

17   over 126, but --

18   Q.    Do you know if that's over 126 or over 160?

19   A.    I can't read it.

20   Q.    Would a blood pressure of 197 over 160 be normal

21   or abnormal?

22   A.    Abnormal.

23   Q.    Would a blood pressure of 197 over 126 be normal

24   or abnormal?

25   A.    Abnormal.


B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    16

1    Q.   Tell me what the treatment was for Ms. Love or

2  what was done for Ms. Love initially after she was moved

3  from triage to the treatment area.

4    A.   She wasn't moved from triage, sir.  She came

5  right into the emergency room.

6    Q.   And what happened from that point on?

7    A.   According to the notes before me -- the nurse

8  before me, is that what you want to know?

9    Q.   What happened once she was admitted to the

10  emergency room?

11   A.   She was brought in by the squad and she was

12  examined by the doctor, placed on a monitor, had an EKG

13  and blood work done and x-ray.

14   Q.   She was brought in by the squad, what does that

15  mean?

16   A.   That she came in by ambulance.

17   Q.   Do you know what her blood pressure was on

18  admission?

19   A.   It would be right here.  197 over -- I can't read

20  that last number.

21   Q.   Do you know what her blood pressure was when she

22  was in the ambulance?

23   A.   No, I do not.

24   Q.   Is there any record in the chart that indicates

25  what her blood pressure was when she was being

B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    17

1    transported to the hospital?

2      A.    There should be a squad flow sheet, but I don't

3    see it on the chart.   There's also a squad flow sheet

4    and it's not here.

5      Q.    After the 197 over whatever that number was --

6    I'll assume that it's 160 which has been the testimony

7    thus far -- when was the next blood pressure taken?

8              MS. PARSONS:   Object to the form.

9          You can answer.

10     A.    This one right here?

11             MS. PARSONS:   He asked when the

12         next one was.

13     A.    Next one.   It says -- 5:30.   It would be 5:15.

14   It would be 5:15.

15   BY MR. SEIDEL:

16     Q.    What was her blood pressure at 5:15?

17     A.    I have to find it.   I'm sorry.   It was at 5:30.

18     Q.    So a half hour after the admission time,

19   according to the nurse's record, the next blood pressure

20   was taken?

21     A.    I would assume it was 5:30.   She was -- unless it

22   was over here, but I don't see that on -- she has the

23   pulse, but I don't see the blood pressure.   I don't see

24   the 5:15.

25     Q.    So assuming that 5:30 was the first time, what

                B & R   SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                           18

1    was her blood pressure then?

2       A.   182 over 113.

3       Q.   Is that normal?

4                MR. HAFTEL:  I'm sorry, 182 over

5            113?

6                THE WITNESS:  Yes.

7    BY MR. SEIDEL:

8       Q.   Is that normal?

9       A.   No.

10               MR. HAFTEL:  If you can try to

11           keep your voice up.

12               THE WITNESS:  Okay.  I'm sorry.

13   BY MR. SEIDEL:

14      Q.   When was the next blood pressure taken?

15      A.   It's every 15 minutes.

16      Q.   When was the next blood pressure taken?

17      A.   5:45.

18      Q.   I'll ask you to take a look at the nurses' notes,

19   if you would, and look at the handwritten blood pressure

20   recordings.

21      A.   Uh-huh.

22      Q.   The blood pressure recording that is noted at

23   5:38, do you see that?

24      A.   5:30 and 5:45.

25      Q.   Is that at 5:38 or is that at 5:30 p.m.?

B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    19

1    A.   That's 5:30 p.m.

2    Q.   Whose writing is that?

3    A.   That's Beth's.

4    Q.   Beth Slimm?

5    A.   Yes.

6    Q.   At what point does your writing come in on this

7    chart?

8    A.   It comes in at 6:20.

9    Q.   Do you know if you were involved in Ms. Love's

10   care prior to 6:20?

11   A.   No, I wasn't.

12   Q.   When you started treating or started being

13   involved in Miss Benn's treatment -- I'm sorry,

14   Ms. Love's treatment, did you review the chart to see

15   what had been done and what her vital signs were prior

16   to your involvement?

17   A.   Yes, and I got a verbal report from Beth.

18   Q.   Did you make a note about your verbal report from

19   Miss Benn --

20   A.   No.

21   Q.   Miss Slimm, I'm sorry.

22   A.   No.  Generally we do not do that.

23   Q.   Did you speak to Dr. Oxler at the time that you

24   started caring for Ms. Love?

25   A.   I don't recall.


B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    20

1    Q.   Is there any notation in the chart that indicates

2    that you spoke to Dr. Oxler?

3    A.   I don't recall.  There's no -- no, there's

4    nothing on the chart.

5    Q.   After -- what was her blood pressure at 5:45?

6    A.   5:45 is 182 over 113.

7    Q.   So it was the same as it was at 5:30?

8    A.   Yes.

9    Q.   And then when was the next blood pressure taken?

10   A.   5:35.

11   Q.   Looking at the blood pressures from six p.m. to

12   6:15, what were the blood pressures at those two times?

13   A.   144 over -- I think it's 97.  It's not very

14   clear.  And 149 over 100 or 104.  I can't read the

15   writing.

16   Q.   Are those two considered normal blood pressures?

17   A.   No.

18   Q.   As of 6:15 that day, was she considered to be

19   stabilized with regard to her blood pressure?

20             MS. PARSONS:  Object to the form.

21        You can answer.

22   A.   It is still a high blood pressure, but I don't

23   know what a stable blood pressure for this patient would

24   be being hypertensive.

25   BY MR. SEIDEL:


        B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    21

1    Q.   Well, ma'am, how can you provide treatment to the

2    patient if you don't know what her stable blood pressure

3    would be?

4              MS. PARSONS:   Just object to the

5         form.   You can answer.

6    A.   Because she comes into the emergency room

7    hypertensive and I don't have any, you know, knowledge

8    of what her normal blood pressure is.

9    BY MR. SEIDEL:

10   Q.   How would you get that?

11   A.   I wouldn't be able to obtain that.   It's an

12   emergency room.

13   Q.   Would you be able to call her family physician?

14   A.   No.

15   Q.   Something wrong with the telephones that day?

16             MS. PARSONS:   Objection.

17   A.   Nothing wrong with the telephones that day, sir.

18   BY MR. SEIDEL:

19   Q.   She had been in the hospital for over an hour.

20   A.   They --

21   Q.   Is there any --

22             MS. PARSONS:   Wait for a

23        question.

24   BY MR. SEIDEL:

25   Q.   Is there any indication in the chart that during

            B & R   SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    22

1   that hour and 15 minutes that she's been in the hospital

2   as of 6:15 that the family physician was called for a

3   normal blood pressure?

4       A.    The doctor calls the family doctor or requests --

5               MS. PARSONS:   He just asked you

6           if there's any indication in the record

7           if the family physician was called.  Just

8           answer the question that he's asking you.

9               THE WITNESS:  Oh, okay.

10      A.    Not in my notes, no.

11  BY MR. SEIDEL:

12      Q.    Do you have a recollection of discussing any

13  telephone call with Dr. Oxler that any other treating

14  physician would have made to the family physician?

15      A.    No.

16      Q.    After 6:15, when was the next blood pressure

17  taken?

18      A.    Seven o'clock.

19      Q.    As of 6:20 you started treating Ms. Love.  Why

20  was it that starting at 6:15 there aren't blood

21  pressures every five to 15 minutes?

22      A.    There's the time when she was moved from Room 1

23  to Room 12 and she was hooked back up onto the monitor

24  and it was recorded.

25      Q.    Did it take --

B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    23

1      A.    45 minutes -- 6:15 is 45.

2      Q.    Did it take 45 minutes to move her from Room 1 to

3      Room 12?

4      A.    She was moved.  I have 6:20 moved to Room 12,

5      placed on monitor and that's when I got her.

6      Q.    If she was placed on the monitor at 6:20 in Room

7      12, why is there no record of her blood pressure between

8      6:15 and seven o'clock?

9      A.    6:15 and seven o'clock.  I don't know.  I don't

10     remember.

11     Q.    Why is there no handwritten blood pressure for

12     that time?

13     A.    I don't remember, sir.

14     Q.    Let's talk a little bit about medical records.

15     What's the reason that you keep medical records?

16     A.    I don't understand that.  What do you mean by is

17     there a reason I keep medical --

18     Q.    Why do you write anything down in the chart?

19     A.    To document what's -- what the patient is doing

20     and her care.

21     Q.    Were you aware that there was a policy and

22     procedure at the hospital that said that if it isn't

23     documented, it wasn't done?

24     A.    No.

25     Q.    You were not aware that that's what the policies

BETH BENN, R.N.                    24

1    and procedures say?

2      A.   No.

3      Q.   Do you understand that the reason that you write

4    down in the chart or do you understand one of the

5    reasons that you write things in the chart is so that

6    other people who read the chart will see what was done

7    during a particular period of time for the patient?

8      A.   Yes.

9      Q.   And if it's not in the chart, the person who may

10   be reading that chart at some subsequent time would have

11   no idea what was done for that patient?

12             MS. PARSONS:  Just object to the

13        form.  You can answer.

14     A.   Can you repeat that?

15   BY MR. SEIDEL:

16     Q.   Yes.  Do you also understand that if somebody was

17   reading that chart subsequently they would have no idea

18   what happened with that patient during the period of

19   time when there's no record?

20             MS. PARSONS:  Same objection.

21     A.   Well, if it's not here, you're telling me you

22   assume it's not done.  But if the nurse gives an

23   accurate report, then they know what's going on.

24   BY MR. SEIDEL:

25     Q.   Tell me then what her blood pressure was between

           B & R  SERVICES FOR PROFESSIONALS, INC.

BETH BENN, R.N.                    25

1    6:15 and seven o'clock.

2        A.   It's not on here so I can't -- I don't remember.

3        Q.   Do you know as you sit here today what her blood

4    pressure was?

5        A.   No.

6        Q.   The monitor --

7        A.   Uh-huh.

8        Q.   -- when they're placed on the monitor, that

9    automatically starts to run, correct?

10       A.   Yes.

11       Q.   And it keeps running continuously?

12       A.   Yes.

13       Q.   And it automatically creates this record,

14   correct?

15       A.   You have to program the blood pressure.

16       Q.   Okay.  So you program the blood pressure and as

17   long as it's programmed to run --

18       A.   Yes.

19       Q.   -- it will print out the blood pressure without

20   you actually physically taking the blood pressure,

21   correct?

22       A.   Yes.

23       Q.   Can we assume from the fact that there is

24   absolutely no computer-generated blood pressure between

25   6:15 and seven o'clock that there was no monitor on Ms.