```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| DAISY LOVE,<br><br>       Plaintiff,<br><br>     v.<br><br>RANCOCAS HOSPITAL, et al.,<br><br>       Defendants. | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 01-5456<br><br>**OPINION** |

**APPEARANCES:**

KLINE & SPECTER, P.C.
By: Richard S. Seidel, Esq.
1800 Chapel Avenue West
Cherry Hill, New Jersey 08002
     Counsel for Plaintiff.

ORLOVSKY, GRASSO, BOLGER, MENSCHING, HALPIN & DALEY, P.A.
By: Michael G. Halpin, Esq.
1314 Hooper Avenue
Toms River, New Jersey 08753
     Counsel for Defendant Beth Benn, R.N.

GROSSMAN, KRUTTSCHNITT, HEAVEY & JACOB
By: Thomas J. Heavey, Esq.
1608 Highway 88 West
Brick, New Jersey 08724
     Counsel for Defendant Beth Slimm, R.N.


**IRENAS**, Senior District Judge:

     Plaintiff Daisy Love ("Plaintiff") brought the instant lawsuit alleging medical malpractice by Rancocas Hospital ("Hospital"), Steven Oxler, M.D. ("Dr. Oxler"), Beth Slimm, R.N. ("Slimm"), and Beth Benn, R.N. ("Benn").  Presently before the Court are the Motions to Dismiss by Benn and Slimm on the ground

1

that the claim against them is barred by New Jersey's two year statute of limitations for medical malpractice actions. For the reasons set forth below, this Court grants the Motions to Dismiss.

I.

At approximately 5:00 p.m. on March 10, 2000, Plaintiff was brought to the Hospital by ambulance after experiencing episodes of syncope (a temporary loss of consciousness, generally due to an insufficient flow of blood to the brain), falling, and poorly controlled high blood pressure.[1] She was treated at the Hospital by Dr. Oxler, Slimm, and Benn. Dr. Oxler was Plaintiff's treating physician on that day. Slimm cared for Plaintiff from approximately 5:00 p.m. until 6:20 p.m., and Benn cared for Plaintiff from approximately 6:20 p.m. until Plaintiff was discharged later that night.

While in the emergency department of the Hospital, Plaintiff's blood pressure was taken by a nurse upon her arrival, as well as at 5:38 p.m., 5:45 p.m., 6:00 p.m., and 6:15 p.m. Plaintiff's blood pressure was later monitored by machine, which issued blood pressure readings at 15 minute intervals from 7:00 p.m. to 8:15 p.m. There are no records of blood pressure readings between 6:15 p.m. and 7:00 p.m. By 8:15 p.m.,

---

[1] Plaintiff was accompanied to the Hospital by her friend Alice Battle.

Plaintiff's blood pressure had been brought down from 200/110 to 133/91.[2] Plaintiff was discharged at approximately 8:30 p.m., and given written discharge materials signed by Benn instructing Plaintiff to discontinue taking Atenolol, a medication for hypertension, to follow up with her primary care physician in three days and when getting out of bed, to sit on the side of the bed for five minutes before standing up. An ambulance was called to take Plaintiff home.

After she was discharged and while waiting for the ambulance at approximately 8:40 p.m., Plaintiff fell off of the bed on which she was sitting. Her blood pressure was taken twice at this time by Benn, with readings of 180/110 and 170/100. Neither Dr. Oxler, Benn nor Slimm examined Plaintiff between 8:45 p.m., when her blood pressure was last taken, and when she left the Hospital at approximately 10:40 p.m. Plaintiff was nevertheless allowed to leave the Hospital and was brought back to her home by ambulance.

At his deposition, Dr. Oxler acknowledged that the readings taken at 8:40 p.m. indicated that Plaintiff's blood pressure was

---

[2] High blood pressure is defined as a systolic measurement, or the pressure of the blood against arterial walls after the heart has just finished contracting, of 140 millimeters of mercury or above, and a diastolyic measurement, the pressure of blood between heartbeats, of 90 millimeters of mercury or above. Ellie Rodgers, *High Blood Pressure (Hypertension) Overview*, *available at* http://my.webmd.com/hw/hypertension/hw62789.asp?pagenumber=1 (last modified May 28, 2004).

elevated, and her blood pressure would not have been considered stable at that point.  Dr. Oxler testified that if he had known Plaintiff's blood pressure was 180/110 at 8:40 p.m., he would not have allowed her to leave.  Benn testified at her deposition, however, that she remembered telling Dr. Oxler about the two blood pressure readings taken after Plaintiff's fall.  Benn stated that she informed the doctor about Plaintiff's blood pressure readings after the discharge order had been given but before Plaintiff left the Hospital.[3]

On or about March 12, 2000, Plaintiff was taken back to the Hospital and admitted as an inpatient.  She suffered from the same symptoms as she had on March 10, 2000, in addition to right-sided weakness, slurred speech and a facial droop.  At that time it was determined that Plaintiff had suffered a stroke.

On March 16, 2000, Plaintiff was discharged from the Hospital and transferred to a comprehensive inpatient rehabilitation program, where she stayed until April 17, 2000. Plaintiff received home health care for approximately a month after her release from the rehabilitation program, but was unable to continue living alone as a result of her stroke.  Plaintiff moved to Mobile, Alabama, in June, 2000, to live with her daughter.  Despite continuing therapy, Plaintiff is unable to

---

[3]Plaintiff deposed Dr. Oxler on March 11, 2003, Slimm on October 2, 2003, and Benn on October 30, 2003.  Plaintiff's experts Dr. Ira Mehlman, M.D., and Sheila DeRiso, R.N., C.E.N., were deposed on December 20, 2004.

live independently and requires the assistance of others for tasks such as meal preparation, bathing and dressing. Her mobility is limited, as she cannot ascend or descend stairs independently and requires a wheelchair to ambulate any distance or for a prolonged period of time.

Plaintiff filed her original complaint on November 27, 2001, naming Rancocas Hospital, Steven Oxler, M.D., and John Doe, Mary Doe, ABC Partnerships and XYZ Corporations as Defendants.[4] Plaintiff alleges that her injuries are a direct result of the failure of the Defendants to care for and properly treat her. In compliance with N.J.S.A. 2A:53A-27, Plaintiff attached to her original complaint an Affidavit of Merit by Ira Mehlman, M.D., attesting that the treatment Plaintiff received at the Hospital fell below the appropriate standard of care.

On February 23, 2004, Plaintiff filed a motion for leave to file a Third Amended Complaint in order to join Benn and Slimm as Defendants in their individual capacities.[5] Magistrate Judge

---

[4] This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the matter is between citizens of different states and the sum in controversy exceeds $75,000.00. Plaintiff is a resident of the State of Alabama and all Defendants are residents of the State of New Jersey.

[5] Plaintiff first amended her complaint on March 7, 2002, joining Sunset Road Medical Association, Andrew J. Blank, D.O., and Gary D. Greenberg, P.A.-C. as Defendants. The First Amended Complaint alleged deviations from standard of care against the newly named Defendants. Plaintiff filed her Second Amended Complaint on July 16, 2002, adding as a Defendant Joseph B. Levin, M.D. A stipulation of dismissal as to Dr. Blank was entered on November 12, 2002. Summary judgment was granted in

Anne Marie Donio concluded that the proposed claim against the two nurses did not relate back to the November 27, 2001, filing date through fictitious party pleading and Fed. R. Civ. P. 15(c), because Plaintiff conceded that the identity of the nurses was available at that time she filed her Complaint. *Love v. Rancocas Hospital*, No. 01-5456 (D.N.J. Apr. 14, 2004).

Magistrate Judge Donio granted Plaintiff's motion, however, concluding that "the Court cannot say with certainty that the amendment is futile on statute of limitations grounds, as . . . the discovery rule may very well apply." *Id*. at 11. The Court noted that the crucial issue was whether the alleged responsibility of Benn and Slimm was discoverable by Plaintiff prior to the depositions taken in 2003, and stated that "these statute of limitations issues may be brought by way of dispositive motion as a result of facts developed during discovery." *Id.* Plaintiff filed the Third Amended Complaint on April 27, 2004.[6]

---

favor of Dr. Levin on July 16, 2003. A stipulation of dismissal with respect to Greenberg, Dr. Levin, and Sunset Road Medical Association was entered on March 12, 2004.

[6]The Third Amended Complaint also adds a cause of action against the Hospital under 42 U.S.C. § 1395dd, the Emergency Medical Treatment and Active Labor Act ("EMTALA").

6

II.

Under Fed. R. Civ. P. 56(c)[7] a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The non-moving party may not simply rest on its pleadings to oppose a summary judgment motion but must affirmatively come forward with admissible evidence establishing a genuine issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The role of the court is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

---

[7]The motions of Benn and Slimm do not cite a particular Federal Rule of Civil Procedure. However, because matters outside the Complaint are being considered, the Court will treat their requests as motions for summary judgment pursuant to Rule 56.

III.

Benn and Slimm argue that any claims against them by Plaintiff are barred by the statue of limitations.  Benn and Slimm contend that the statute of limitations expired on March 10, 2002, two years from the date Plaintiff was discharged from the Hospital.  Plaintiff maintains that the statute of limitations for claims against Benn and Slimm was tolled until November 15, 2003, the date of Nurse DeRiso's expert report, because it was not until this day that Plaintiff was aware of any responsibility of the nurses for her injury.

A.

N.J.S.A. 2A:14-2 provides that the statute of limitations for medical malpractice claims expires two years after date on which the cause of action accrued.  However, in three decisions, the New Jersey Supreme Court held that the two year limitations period could be tolled in a medical malpractice case "until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered [,] that [he or she] may have a basis for an actionable claim." *Guichardo v. Rubinfeld*, 177 N.J. 45, 51 (2003) (quoting *Lopez v. Swyer*, 62 N.J. 267, 274 (1973)); *see also Gallagher v. Burdette-Tomlin Memorial Hospital*, 163 N.J. 38 (2000); *Mancuso v. Neckles*,

163 N.J. 26 (2000).  New Jersey courts apply the discovery rule to "avoid the potentially harsh effects of the 'mechanical application' of statutes of limitations."  *Guichardo*, 177 N.J. at 51.

When a plaintiff maintains that she was unaware of the basis for a cause of action against a proposed defendant, the New Jersey Supreme Court in *Guichardo* noted that:

> To start the statute of limitations running in a case involving "complex medical causation," in which "it is not at all self-evident that the cause of injury was 'the fault of . . . a third party,'" . . . "more is required than mere speculation or an uninformed guess 'without some reasonable medical support' that there was a causal connection" between the plaintiff's condition and the third party's conduct.

177 N.J. at 51 (citations omitted).  *Mancuso* held that "when a patient has relied on competent expert advice that one or more of her treating physicians did not contribute to the patient's injuries, later assertions to the contrary by a competent expert would then provide the 'basis for an actionable claim.'"  163 N.J. 26 at 37.

The New Jersey Supreme Court has also stressed that the plaintiff must exercise "reasonable diligence and intelligence" in asserting her claim.  *Gallagher*, 163 N.J. at 43.  The nature of information known to the plaintiff is a crucial consideration in determining whether a plaintiff will receive the benefit of the discovery rule, as well as the time at which a plaintiff first learned or had reason to know that a third person may also

have been responsible for her injuries.

Benn and Slimm contend that Plaintiff was not reasonably diligent in asserting her claim against them. They maintain, and Plaintiff has admitted, that the identities of the nurses were known to Plaintiff prior to the expiration of the statute of limitations. They argue that the notes of the emergency room nurses, containing the signatures of Benn and Slimm, revealed information that could provide the basis for a negligence claim against them.

Benn and Slimm also argue that Plaintiff had, or could obtain, all the information necessary to get an expert nursing opinion on the care provided by the nurses, prior to their depositions or that of Dr. Oxler. Benn and Slimm contend that the deposition taken of nursing expert Sheila DeRiso on December 20, 2004, "affirms that Plaintiff had available to them all the information they needed to get an expert nursing opinion critical of either or both Nurse Benn or Nurse Slimm, and did not require the depositions of either nurse and Dr. Oxler to be reasonably aware of the existence of her claim against Nurse Benn and Nurse Slimm individually." (Def. Br. at 17.)

Plaintiff argues that she was not aware of the need to consult a nursing expert or investigate the liability of Benn and Slimm until the depositions of Dr. Oxler and the nurses put her on notice Benn and Slimm's actions may have contributed to her

10

injury.  She contends that she was unaware of any basis for liability of the nurses until after the depositions of Dr. Oxler, Benn and Slimm revealed inconsistencies in their accounts of which blood pressure readings Dr. Oxler was made aware of by the nurses when he authorized the discharge of Plaintiff and allowed her to return home.[8]

Plaintiff contends that she relied on the expert report of Dr. Mehlman, who did not discuss or identify particular failings of the care and treatment rendered by the nurses.  Dr. Mehlman's letter to Plaintiff's former counsel, dated July 4, 2001, stated that "[t]he standards of care required the patient to be admitted, the patient's blood pressure to be controlled, and appropriate consultation to be obtained with a neurologist to control her blood pressure and obtaining early CT scan of the patient's brain."  (Def. Br., Ex. F at 2.)  Plaintiff contends that she consulted with DeRiso shortly after the deposition of Benn, at which Benn maintained that she informed Dr. Oxler of

---

[8]The Court also notes that Oxler, Benn and Slimm were the people principally responsible for Plaintiff's direct care in the Emergency Department.  It is not be surprising that in their depositions the nurses and the doctor differed on whether the post "discharge" blood pressure readings taken after her 8:40 p.m. fall were promptly relayed to the doctor.  The Emergency Department records make clear that this might be an issue, however, since there is no evidence in the records that there was a medical response to these readings.  These testimonial differences do not bear on the issue of whether Plaintiff had sufficient information long before the limitation period ran "that would alert a reasonable person to the possibility of an actionable claim." *Lapka v. Porter Hayden Co.*, 162 N.J. 545, 555-556 (2000).

11

Plaintiff's later blood pressure readings.[9]

The information in the emergency department records possessed by Plaintiff prior to the depositions, however, clearly "impose[d] on plaintiff a 'duty to act,' that is, to investigate whether there might be a cause of action against" the nurses. *Guichardo*, 177 N.J. at 54.  Plaintiff requested the Emergency Department records on March 16, 2000, and appears to have received them on or about that date.  These records reveal that her blood pressure was taken at inconsistent intervals, including an approximately forty minute gap between her first and second readings.  The Emergency Department Nurses Record indicates that no manual readings were taken between 6:15 p.m. and the untimed readings we now know were taken by Benn at 8:40 p.m. and 8:45 p.m.[10]  Given the close and commonly known relationship between high blood pressure and the incidence of stroke, these gaps should have raised suspicion even in laymen.

The second page of the Emergency Department Nursing Record, detailing Plaintiff's fall at 8:40 p.m., raises further questions about the care provided by the nurses.  The first page indicated

---

[9]Plaintiff's argument that Dr. Oxler's deposition testimony triggered her investigation into the nurses' possible liability is belied by the nursing expert's report.  The report outlines many theories of possible liability, none of which relate to the nurses' alleged failure to advise Dr. Oxler of Plaintiff's post-fall blood pressure readings. (Def. Br., Ex. G.)

[10]Plaintiff received the blood pressure readings taken by machine from 7:00 p.m. to 8:15 p.m. at a later date.

12

that Plaintiff was discharged at 8:30 p.m., yet at least spotty records were kept until 10:40 p.m.  Between the description of Plaintiff's fall at 8:40 p.m. and the notation that Plaintiff was transported home by ambulance at 10:40 p.m. are the two untimed blood pressure readings indicating that Plaintiff's blood pressure had returned to its previously high levels.

The description of Plaintiff's fall on the second page reveals that little attention was given to her after this event. The record states that Plaintiff was "laughing, denies any injuries" and that Dr. Oxler came in to examine Plaintiff, but does not indicate that the nurses performed any other examination of Plaintiff other than the two untimed blood pressure readings. (Emergency Department Nurses Record, Pl. Br., Ex. C at 2.)  The Emergency Physician Record makes no mention of this incident. It is unclear from the face of these records whether any doctor knew of the return of Plaintiff's high blood pressure.  *See* discussion *supra* note 8.  To the extent that the last blood pressure readings are part of the proof that malpractice occurred in the hospital emergency room, the medical records can be read to point a lack of diligence by both the doctor and the nurses.

Additionally, Plaintiff's reliance on Dr. Mehlman's expert report is distinguishable from the plaintiffs in *Guichardo, Mancuso* and *Gallagher*.  In each case, the plaintiffs relied on expert reports that *exonerated* the particular doctor they later

13

sought to add as a defendant. *See Guichardo*, 177 N.J. at 55 (". . . in this appeal, as in *Mancuso* and *Gallagher*, plaintiff reasonably relied on expert advice indicating the absence of fault on the part of a particular care provider.").

Dr. Mehlman's report, which was rendered about a year and a half after the alleged malpractice, did not exculpate the nurses, or for that matter anyone else. No particular health care provider who worked in the hospital emergency room were even identified in his report. Rather, Dr. Mehlman concluded that "the emergency department" deviated from the appropriate standard of care. Among other failings, the expert report did refer to the failure "to control her blood pressure" which could involve not only the failure to prescribe appropriate medication or other treatment, generally the duty of a doctor, but also the failure to regularly monitor blood pressure and report abnormal findings to the medical staff, or to provide medication to the patient after it is prescribed, generally the duties of a nurse. Indeed, far from exonerating the nurses, Dr. Mehlman's report might be construed as suggesting an investigation of the nurses' role in the events of March 10, 2000.

There is nothing in the record which tells us whether Plaintiff or her attorney even considered the possibility that the nurses might be liable until after the depositions revealed the dispute between Benn and Dr. Oxler as to whether the doctor was told of the later blood pressure readings.  However, the

standard for the applicability of the discovery rule is not subjective.  "[T]he proofs [necessary to commence the limitations period] need not evoke a finding that plaintiff knew for a certainty that the factual basis [for a claim] was present.  It is enough that plaintiff had or should have discovered that he 'may have' a basis for the claim."  *Guichardo*, 177 N.J. at 60-61 (Verniero, J., dissenting)(quoting *Burd v. New Jersey Tel. Co.*, 76 N.J. 284, 293 (1978)).[11] *See also Szczuvelek v. Harborside Healthcare Woods Edge*, 182 N.J. 275 (2005); *Troum v. Newark Beth Israel Med. Ctr.*, 338 N.J. Super. 1 (App. Div. 2001).

The Court's conclusion in no way suggests that the magistrate incorrectly allowed Plaintiff to amend her complaint.  To the contrary, Magistrate Judge Donio reasonably concluded that there was a dispute regarding the application of the discovery rule that was properly left to this Court to resolve after the parties had the benefit of further discovery.  Additionally, the Court does not decide today whether the Hospital could be liable

---

[11]In the 4-3 opinion in *Guichardo*, the dispute between the majority and the dissenters did not concern the validity of the discovery rule as applied to medical malpractice actions, but whether the plaintiff did, in fact, rely on prior expert reports exonerating the doctor in question. Writing for the dissenters, Justice Verniero expressed the view that the plaintiff always believed that the doctor was at fault and merely continued to "shop" for an expert until she found one who agreed with her. 177 N.J. at 60. The dissent contended that the majority placed too heavy an emphasis on expert reports, to the exclusion of other evidence indicating that the plaintiff may have known she had a basis for a claim against a particular defendant.

on the theory of *respondeat superior* for the conduct of the nurses or any of its other employees.

IV.

For the reasons set for above, the Court grants the Motions to Dismiss of Benn and Slimm, on the ground that the claims against them in the Third Amended Complaint are barred by the two-year statute of limitations contained in N.J.S.A. 2A:14-2.  The Court will enter an appropriate order.

Date: June 27, 2005

s/Joseph E. Irenas
JOSEPH E. IRENAS
Senior United States District Judge