UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAISY LOVE,<br><br>Plaintiff,<br><br>v.<br><br>RANCOCAS HOSPITAL, et al.,<br><br>Defendants. | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 01-5456<br><br>**OPINION** |

**APPEARANCES:**
KLINE & SPECTER, P.C.
By: Richard S. Seidel, Esq.
1800 Chapel Avenue West
Cherry Hill, New Jersey 08002
Counsel for Plaintiff.

STAHL & DeLAURENTIS, P.C.
By: Jennifer Parsons, Esq.
1103 Laurel Oak Road, Suite 103
Voorhees, New Jersey 08043
Counsel for Defendant Rancocas Hospital.

**IRENAS**, Senior District Judge:

Plaintiff Daisy Love ("Plaintiff") brought the instant lawsuit alleging medical malpractice by Rancocas Hospital ("Hospital"), Steven Oxler, M.D. ("Dr. Oxler"), Beth Slimm, R.N. ("Slimm"), and Beth Benn, R.N. ("Benn"), and violations of the Emergency Medical Treatment and Assisted Labor Act ("EMTALA"), 42 U.S.C. § 1395dd (2003), by the Hospital. Presently before the Court is the Hospital's Motion for Partial Summary Judgment on Plaintiff's EMTALA and "direct" negligence claims against the Hospital. For the reasons set forth below, this Court denies in part and grants in part the Hospital's motion.

I.

At approximately 5:00 p.m. on March 10, 2000, Plaintiff was brought to the Hospital by ambulance after experiencing episodes of syncope (a temporary loss of consciousness, generally due to an insufficient flow of blood to the brain), falling, and poorly controlled high blood pressure.[1] She was treated at the Hospital by Dr. Oxler, Slimm, and Benn. Dr. Oxler was Plaintiff's treating physician on that day. Slimm cared for Plaintiff from approximately 5:00 p.m. until 6:20 p.m., and Benn cared for Plaintiff from approximately 6:20 p.m. until Plaintiff was discharged later that night.

While in the emergency department of the Hospital, Plaintiff's blood pressure was taken by a nurse upon her arrival, as well as at 5:38 p.m., 5:45 p.m., 6:00 p.m., and 6:15 p.m. Plaintiff's blood pressure was later monitored by machine, which issued blood pressure readings at 15 minute intervals from 7:00 p.m. to 8:15 p.m. There are no records of blood pressure readings between 6:15 p.m. and 7:00 p.m. By 8:15 p.m., Plaintiff's blood pressure had been brought down from 200/110 to 133/91.[2] Plaintiff was discharged at approximately 8:30 p.m.,

---

[1]Plaintiff was accompanied to the Hospital by her friend Alice Battle.

[2]High blood pressure is defined as a systolic measurement, or the pressure of the blood against arterial walls after the heart has just finished contracting, of 140 millimeters of mercury or above, and a diastolyic measurement, the pressure of

and given written discharge materials signed by Benn instructing Plaintiff to discontinue taking Atenolol, a medication for hypertension, to follow up with her primary care physician in three days and when getting out of bed, to sit on the side of the bed for five minutes before standing up. An ambulance was called to take Plaintiff home, and Plaintiff remained at the Hospital until the ambulance arrived at 10:40 p.m.

After she was discharged and while waiting for the ambulance at approximately 8:40 p.m., Plaintiff fell off of the bed on which she was sitting. Her blood pressure was taken twice at this time by Benn, with readings of 180/110 and 170/100. Neither Dr. Oxler, Benn nor Slimm examined Plaintiff between 8:45 p.m., when her blood pressure was last taken, and when she left the Hospital at approximately 10:40 p.m. Plaintiff was nevertheless allowed to leave the Hospital and was brought back to her home by ambulance.

At his deposition, Dr. Oxler acknowledged that the readings taken at 8:40 p.m. indicated that Plaintiff's blood pressure was elevated, and her blood pressure would not have been considered stable at that point. Dr. Oxler testified that if he had known Plaintiff's blood pressure was 180/110 at 8:40 p.m., he would not

---

blood between heartbeats, of 90 millimeters of mercury or above. Ellie Rodgers, *High Blood Pressure (Hypertension) Overview*, *available at* http://my.webmd.com/hw/hypertension/hw62789.asp?pagenumber=1 (last modified May 28, 2004).

have allowed her to leave the Hospital. Benn testified at her deposition, however, that she remembered telling Dr. Oxler about the two blood pressure readings taken after Plaintiff's fall. Benn stated that she informed the doctor about Plaintiff's blood pressure readings after the discharge order had been given but before Plaintiff left the Hospital.

On or about March 12, 2000, Plaintiff was taken back to the Hospital and admitted as an inpatient. She suffered from the same symptoms as she had on March 10, 2000, in addition to right-sided weakness, slurred speech and a facial droop. At that time it was determined that Plaintiff had suffered a stroke.

On March 16, 2000, Plaintiff was discharged from the Hospital and transferred to a comprehensive inpatient rehabilitation program, where she stayed until April 17, 2000. Plaintiff received home health care for approximately a month after her release from the rehabilitation program, but was unable to continue living alone as a result of her stroke. Plaintiff moved to Mobile, Alabama, in June, 2000, to live with her daughter. Despite continuing therapy, Plaintiff is unable to live independently and requires the assistance of others for tasks such as meal preparation, bathing and dressing. Her mobility is limited, as she cannot ascend or descend stairs on her own and requires a wheelchair to ambulate any distance or for a prolonged period of time.

Plaintiff filed her original complaint on November 27, 2001, naming the Hospital, Oxler, and John Doe, Mary Doe, ABC Partnerships and XYZ Corporations as Defendants.[3] Plaintiff alleges that her injuries are a direct result of the failure of the Defendants to care for and properly treat her. In compliance with N.J.S.A. 2A:53A-27, Plaintiff attached to her original complaint an Affidavit of Merit by Ira Mehlman, M.D., attesting that the treatment Plaintiff received at the Hospital fell below the appropriate standard of care. Plaintiff filed the Third Amended Complaint[4] on April 27, 2004, adding a cause of action against the Hospital under EMTALA.[5]

---

[3]This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the matter is between citizens of different states and the sum in controversy exceeds $75,000.00. Plaintiff is a resident of the State of Alabama and all Defendants are residents of the State of New Jersey.

[4]Plaintiff first amended her complaint on March 7, 2002, joining Sunset Road Medical Association, Andrew J. Blank, D.O., and Gary D. Greenberg, P.A.-C. as Defendants. The First Amended Complaint alleged deviations from standard of care against the new Defendants. Plaintiff filed her Second Amended Complaint on July 16, 2002, adding as a Defendant Joseph B. Levin, M.D. A stipulation of dismissal as to Dr. Blank was entered on November 12, 2002. Summary judgment was granted in favor of Dr. Levin on July 16, 2003. A stipulation of dismissal with respect to Greenberg, Dr. Levin, and Sunset Road Medical Association was entered on March 12, 2004.

[5]The Third Amended Complaint also added Benn and Slimm as Defendants in their individual capacities. The Court dismissed the claims against the two nurses in an Opinion and Order dated June 27, 2005. *Love v. Rancocas Hospital*, Civ. No. 01-5456, 2005 WL 1515329 (D.N.J. June 27, 2005).

II.

Under Fed. R. Civ. P. 56(c) a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The non-moving party may not simply rest on its pleadings to oppose a summary judgment motion but must affirmatively come forward with admissible evidence establishing a genuine issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The role of the court is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

III.

Plaintiff's Third Amended Complaint alleges that the Hospital violated EMTALA, 42 U.S.C. §1395dd (2003), by discharging her before her blood pressure was stabilized. The

Hospital argues that this claim should be dismissed because Plaintiff cannot point to any facts or expert testimony in the record in support of her claim.

The Third Circuit has not yet been presented with the opportunity to construe the provisions of EMTALA. Other circuits have generally recognized that the statute was enacted as a response to reports of "patient dumping" in hospitals. *See Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 142 (4th Cir. 1996) (collecting cases); *see also Mazurkiewicz v. Doylestown Hosp.*, 305 F. Supp. 2d 437, 443 (E.D.Pa. 2004) ("*Mazurkiewicz II*"). "Its core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat." *Bryan v. Rectors and Visitors of the Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996); *see also Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 792-93 (2d Cir. 1999). EMTALA was not intended to provide a federal remedy for medical malpractice. *Mazurkiewicz II*, 350 F. Supp. 2d at 443; *Hardy*, 164 F.3d at 792-93.

EMTALA's provisions are directed at two classes of patients who seek treatment in emergency rooms, individuals with emergency medical conditions and pregnant women in active labor. EMTALA provides two avenues for plaintiffs to make claims under the statute: (1) a patient must receive "appropriate medical

screening" and (2) a hospital may not discharge or transfer to another facility a patient with an emergency medical condition without first stabilizing the patient's condition. *See Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 250-51 (1999).

In relevant part, EMTALA provides:

> (a) Medical screening requirement
>
> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.
>
> (b) Necessary stabilizing treatment for emergency medical conditions and labor
>
> (1) In general
>
> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--
>
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>
> (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.
>
> . . .
>
> (c) Restricting transfers until individual stabilized
>
> (1) Rule
>
> If an individual at a hospital has an emergency medical condition which has not been stabilized (within the

> meaning of subsection (e)(3)(B) of this section), the hospital may not transfer the individual . . . .

42 U.S.C. § 1395dd.

The Hospital does not dispute that Plaintiff may have had an emergency medical condition or that she was discharged before she was stabilized, but rather argues that there is no evidence that Plaintiff received "disparate or discriminatory care." (Def. Reply Br. at 3.) The Hospital relies on a line of cases which concluded that EMTALA's protections apply only to those patients who are unable to pay for their medical care. *See, e.g., Marshall v. East Carroll Parish Hosp.*, 134 F.3d 319, 322 (5th Cir. 1998); *Vickers*, 78 F.3d at 142. The Hospital contends that it did not violate EMTALA because Plaintiff received the same care that would be given to any patient who was able to pay for her care. The Hospital also asserts that this is a "garden variety" medical malpractice claim, as Plaintiff contends that she received inadequate medical care, rather than no care or discriminatory care, and therefore her claim does not fall within EMTALA. (Def. Reply Br. at 3.) Finally, the Hospital argues that Plaintiff has failed to present any expert testimony in support of her EMTALA claim.

Plaintiff contends that summary judgement should be denied because there is an issue of material fact as to whether "plaintiff was discharged at a time when deterioration of her condition was likely," in violation of EMTALA's stabilization

requirement. (Pl. Br. at 7.) Plaintiff argues that she is required to prove only that she had an emergency medical condition, the Hospital knew of her condition, and that she was not stabilized before her discharge. (Pl. Br. at 8, *citing Mazurkiewicz v. Doylestown Hosp.*, 223 F. Supp. 2d 661, at 665-66 (E.D.Pa. 2002) ("*Mazurkiewicz I*").) Plaintiff also argues that the Supreme Court held in *Roberts* that ill motive is not required to establish a stabilization claim under EMTALA. (Pl. Br. at 8-9, *citing Roberts*, 525 U.S. at 252-53.)

Finally, Plaintiff maintains that the Hospital's assertion that Plaintiff is required to provide expert testimony in support of her EMTALA claim is without authority. Plaintiff offers the reports of Dr. Mehlman, Dr. Farber and DeRiso, which she contends "establish the failure to conduct any examinations and to stabilize the patient during her admission to the emergency room and establish that the plaintiff suffered injury as a result of the failure of the hospital to stabilize her condition." (Pl. Br. at 9.)

A.

The text of EMTALA does not contain a provision limiting the applicability of the statute to people who are indigent or uninsured, nor does it contain any express prohibition of disparate or discriminatory care. In fact, the paragraphs of the

statute outlining a hospital’s duties to provide appropriate medical screening and necessary stabilizing treatment specify that the provisions apply to any individual, regardless of whether the person is eligible for federal health insurance benefits for the elderly and disabled. 42 U.S.C. § § 1395dd(a), (b)(1).

The Circuits are split on whether the statute provides protection only to those patients who are indigent or uninsured. The courts generally concur that EMTALA was enacted to address the problem of hospital emergency rooms turning patients away for “non-medical reasons.” *See, e.g., Bryan*, 95 F.3d at 351-52 (collecting cases). Some courts, including those cited by the Hospital, rely on the legislative history of EMTALA in holding that Congress intended the statute to insure that indigent and uninsured patients receive the same emergency care as those with medical insurance. *See, e.g., Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132 (8th Cir. 1996)(en banc).

The better view is represented by those courts which hold that EMTALA applies regardless of the patient’s ability to pay or whether the patient has health insurance. The Sixth Circuit in *Cleland v. Bronson Health Care Group*, 917 F.2d 266, 270 (6th Cir. 1990), held that “the text [of EMTALA] must control over the legislative history.” *Cleland* noted that its conclusion that EMTALA applies to all patients conflicted with express statements

in the legislative history, but stated:

> [The Court's holding] leads to a result considerably broader than one might think Congress should have intended, or perhaps than any or all individual members of Congress were cognizant of. However, it is not our place to require statutes to conform with our notions of efficacy or rationality. . . . It is only where the language that Congress uses admits of varying interpretations that secondary means of interpretation come into play.

*Id.; see also Bryant v. Adventist Health System/West*, 289 F.3d 1162, 1165 (9th Cir. 2002) ("EMTALA protects all individuals, not just those who are uninsured or indigent.").

The Supreme Court's holding in *Roberts* that no showing of improper motive is required to establish a violation of EMTALA's stabilization requirement gives further support for the conclusion that EMTALA applies regardless of whether the patient is uninsured or indigent. 525 U.S. at 252-53. This Court declines to import limitations on EMTALA's applicability from other sources where the language of EMTALA clearly states that all people are covered under the statute. *See In re T.M.I.*, 67 F.3d 1119, 1123 (3d Cir. 1995)("'It is axiomatic that statutory interpretation begins with the language of the statute itself . . . and if the statutory language is unambiguous, the plain meaning of the words ordinarily is regarded as conclusive.'")

B.

In order to establish a violation of EMTALA's stabilization

provision, a plaintiff must prove: "(1) the patient had an emergency medical condition, (2) the hospital actually knew of that condition, (3) the patient was not stabilized before being transferred."[6] *Mazurkiewicz I*, 223 F. Supp. 2d at 665 (citing *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 883 (4th Cir. 1992)). Plaintiff need not demonstrate that she received disparate or discriminatory care.

The Hospital is correct that EMTALA does not cover ordinary medical malpractice claims. Plaintiff, however, has raised substantial issues of material fact as to whether the Hospital violated EMTALA in releasing her before her medical condition was stabilized, in addition to alleging a state law malpractice claim. EMTALA defines an "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity . . . such that the absence of immediate medical attention could reasonably be expected to result in– (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . . ." 42 U.S.C. § 1395dd(e)(1)(A). Plaintiff has clearly raised an issue of material fact as to whether she suffered from an emergency medical condition, given the evidence of her high and unstable

[6]EMTALA defines "transfer" to include the discharge of a patient. 42 U.S.C. § 1395dd(e)(4).

blood pressure readings, syncope and repeated falls, which are classic symptoms of possible stroke.

EMTALA requires a hospital to provide "for such further medical examination and such treatment as may be required to stabilize[7] the medical condition," 42 U.S.C. § 1395dd(b)(1)(A), and prohibits a hospital from discharging a person with an emergency medical condition before the patient is stabilized,[8] 42 U.S.C. § 1395dd(c)(1), except in situations not applicable here.[9] Plaintiff maintains that she was not provided with the necessary stabilizing treatment, and was discharged before her condition was stabilized.

Plaintiff has raised a genuine issue of material fact as to whether she received the treatment necessary to stabilize her condition and whether she was stable when she was discharged from

---

[7]EMTALA defines the term "to stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility. . . ." 42 U.S.C. § 1395dd(e)(3)(A).

[8]The term "stabilized" is defined as "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility. . . ." 42 U.S.C. § 1395dd(e)(3)(B).

[9]EMTALA allows transfers of unstable patients where the patient requests a transfer in writing, a physician certifies that the medical benefits of a transfer outweighed the risks, or a qualified medical person has signed such a certification after consulting with a doctor, and the transfer is appropriate. 42 U.S.C. § 1395dd(c).

the Emergency Department. The expert reports of Dr. Mehlman, Dr. Farber and DeRiso identify specific steps that the Emergency Department failed to take to stabilize Plaintiff's blood pressure.[10] (Pl. Br., Ex. E.) Dr. Oxler admitted at his deposition that Plaintiff's blood pressure readings at 8:40 p.m. and 8:45 p.m. indicated that her condition was not stable. (Dep. of Steven Oxler, at 31-36, Pl. Br., Ex. C.) Additionally, the Emergency Department Nurses Record shows that Plaintiff fell and her blood pressure readings spiked shortly after Dr. Oxler discharged Plaintiff but before Plaintiff left the hospital, raising a material issue of fact as to whether her condition was stable when she left the hospital several hours later. (Pl. Br., Ex. B.) The fact that the Emergency Department ordered an ambulance to take Plaintiff home also raises questions as to the stability of her condition at the time she was discharged.

For these reasons, the Hospital's Motion for Partial Summary

---

[10]The Hospital maintains that Plaintiff has failed to submit the required expert report in support of her EMTALA claim. While none of Plaintiff's experts specifically mention EMTALA, several of their conclusions are directly relevant to the issue of whether Plaintiff had an emergency medical condition, whether she received the necessary stabilizing treatment or if she was discharged before her condition was stabilized. The Court notes that nothing in EMTALA or any of the decisions construing the statute expressly require expert reports to be submitted. If Plaintiff's claim involved allegations that the Hospital's screening procedures were inadequate and in violation of EMTALA, an expert report specifically addressing that issue may be required. Here, however, the reports Plaintiff has submitted sufficiently address the allegations of her EMTALA claim.

Judgment as to the EMTALA claim is denied. The Court notes, however, that its holding today regarding EMTALA is limited to Plaintiff's claim that the Hospital discharged her before her condition was stabilized. Plaintiff's claim that the Emergency Department failed to diagnose or misdiagnosed her condition does not fall under EMTALA, as it is in the province of state medical malpractice law. This Court makes no comment as to (1) what damages, if any, would be available should Plaintiff prevail on the merits of her EMTALA claim, or (2) what proof would be necessary to establish a valid damage claim.

IV.

The Hospital also seeks summary judgment on any "direct" claims of negligence against it. Plaintiff's Complaint asserts multiple grounds for her claim of negligence, (Compl., ¶ 31(a)-(i)), but the Hospital does not make clear which of the particular theories of negligence contained in the Complaint it seeks to have dismissed in the instant Motion. Plaintiff states in her brief that she has a claim against the Hospital for "direct corporate liability," (Pl. Br. at 6), but does not specify which of her allegations give rise to this alleged "direct" liability.

Corporate liability is the liability of a corporate body for the conduct of its agents or employees, where an employee or

agent is acting on behalf of the corporation. *Hardwick v. American Boychoir School*, 368 N.J. Super. 71, 101-102 (App. Div. 2004). Since a corporation is a legal fiction, all corporate liability is based on the actions or inactions of individual employees or agents, and the notion of "direct" liability versus vicarious liability is illusory.

The Court interprets the parties' use of the term "direct" to distinguish between those acts which were related to the health care provided by the doctor and nurses, and those acts which were administrative and supervisory. Therefore, the Court surmises that the Hospital is moving for summary judgment on the theory contained in Paragraph 31(f) of the Complaint, which alleges a cause of action for "failing to properly and adequately train and instruct their employees and agents, real and ostensible, and failing to supervise the same." (Compl., at ¶ 31(f).)

There is scarce caselaw in New Jersey explaining a hospital's liability for failing to train or supervise its medical staff. In *Corleto v. Shore Memorial Hospital*, 138 N.J. Super. 302 (Law Div. 1975), the leading case in New Jersey, the Superior Court held that a hospital could be liable for allowing an incompetent doctor to have surgical privileges and for not removing that doctor from a surgical procedure when the situation went beyond his level of competence. *Id.* at 309.

In *Corleto*, the decedent's estate sued the hospital for permitting a surgeon to perform abdominal surgery on the decedent, who died as a result of the doctor's negligence. *Id.* at 306-7. The court held that the hospital could be liable for allowing the doctor to perform the surgery even though the doctor was not an employee of the hospital and the hospital could not be vicariously liable for his actions. *Id.* at 306-9.

The Superior Court stated "the moving defendants are charged with wrongdoings separate and distinct from that of Dr. McCracken, albeit that plaintiffs would obviously have to establish wrongdoing on the part of that doctor in order to prevail against the other defendants." *Id.* at 306; *see also President v. Jenkins*, 357 N.J. Super. 288, 316 (App. Div. 2003)(finding that "a hospital may be liable vicariously for the negligence of a staff physician, . . . , and directly for its selection and appointment of an unqualified, unskilled or incompetent physician . . ."); *Suenram v. Society of the Valley Hosp.*, 155 N.J. Super. 593, 599 (Law Div. 1977) (finding that "the hospital does have a duty to review the quality of patient care and provide safeguards to insure that, for instance, only competent physicians are admitted to the hospital's surgical staff").

Here, Plaintiff has not alleged that Dr. Oxler, Benn or Slimm were incompetent or unfit to treat her, nor has she alleged

that the Hospital was negligent in hiring or training Benn or Slimm, or allowing Dr. Oxler to practice in the Emergency Department. Nor has Plaintiff alleged that the procedures established by the Hospital to operate the Emergency Department were somehow defective. The Court cannot identify a factual basis from Plaintiff's Complaint or opposition papers for a claim of liability based on a failure to train the Hospital's personnel, its appointment of unskilled or unqualified health care providers, or a failure to establish proper procedures for running the Emergency Department. Therefore, the Court will grant summary judgment to the Hospital on such claims. This holding, however, does not prevent Plaintiff from arguing that the Hospital could be liable for the actions of Dr. Oxler,[11] Benn or Slimm based upon some theory of *respondeat superior* or vicarious liability.

V.

For the reasons set for above, the Court denies the Motion for Summary Judgment as to Plaintiff's EMTALA claim and grants the Motion as to Plaintiff's "direct" negligence claim. The

---

[11]It is unclear from the motion papers whether Dr. Oxler is an employee of the Hospital, is an employee of some professional corporation or association which has a contract to provide emergency services to the Hospital, or has some other relationship with the Hospital.

Court will enter an appropriate order.

Date: June 29 , 2005

s/Joseph E. Irenas
JOSEPH E. IRENAS
Senior United States District Judge